[No. 5590.]

THE GREAT WESTERN SUGAR COMPANY v. WHITE ET AL.

1. **Contracts—Interpretation—Conduct of Parties**—The conduct of parties to a contract will not be received to contradict and overthrow its plain and unambiguous provisions.—(553)

2. ——**Affecting the Rights of Third Parties**—Where the contract affects the rights of third persons, not parties to it, doubted if the conduct of parties to the contract should be received, as against such third parties, to affect its interpretation.—(554)

3. ——**Strict Construction against Promisor**—Doubted if the rule that a contract is taken most strongly against the promisor, should apply, where third parties are interested.—(554)

4. **Contracts Construed**—Covenant of an irrigating corporation' "To supply continuously" to a manufacturing corporation a certain volume of water, through its canal during a certain period in each year, "from such water" as the irrigating company "may be able to lawfully get into its canal or reservoir," "the maximum quantity to be drawn from said reservoir not to exceed" a specified fraction of the water in the reservoir each year, followed by stipulations relieving the irrigating company from liability for any failure in the supply, accident, or absence of legal capacity to so contract. Held that only the specified fraction of the contents of the reservoir could be withdrawn in each year from the reservoir, or its source of supply, toward satisfying the contract. The irrigating company, on bill brought by those entitled to the water from the reservoir, for the irrigation of their lands, was restrained from delivering to the manufacturing company, or permitting it to receive, from the reservoir, or its source of supply, a greater volume than the stipulated fraction, and from diverting therefrom water that might lawfully be stored in such reservoir.—(554-557)

*Appeal from Weld District Court*—Hon. JAMES E. GARRIGUES, Judge.

Messrs. WOLCOTT, VAILE & WATERMAN, and Mr. H. M. HAYNES, for appellant.

Mr. CHARLES D. TODD, for appellee.

Mr. JUSTICE MUSSER delivered the opinion of the court:

On December 26, 1900, The Greeley and Loveland Irrigation and Land Company was the owner of two ditches and a reservoir, supplied from the Big Thompson river. One of the ditches was the Loveland and Greeley canal, hereinafter referred to as the canal, a large ditch running a distance of about twenty-five miles easterly from the river. The other was the Barnes ditch, heading about two miles up the river from the canal and running in an easterly direction about seven miles. The reservoir, which was constructed in 1893, was about three-quarters of a mile north of the canal and was fed by the Barnes ditch. From the time of its construction to the year 1901, without dispute, and by the finding of the court to the commencement of this action in 1904, it appears that all of the water reaching the headgate of the Barnes ditch was diverted from the river and carried through that ditch into the reservoir. From thence the water was drawn off through a tunnel and open ditch, emptied into the canal and, through the latter, delivered to water consumers along the canal, who were owners of reservoir rights. A reservoir right was the right to receive 1-300 part of such water as might be annually stored in, and capable of being drawn off at the outlet of said reservoir, and the company owning the reservoir agreed to use ordinary diligence to fill the reservoir each year from its appropriation. There were in all 300 of these rights. Aside from the water which was discharged into the canal directly from the reservoir, the only other sources of water supply for the canal were the accretions in the river, below the headgate of the Barnes ditch, and such water as might come by seepage from the reservoir. Each of the aforesaid ditches were enlargements of older ditches with certain rights for

direct irrigation, which are left out of view in the discussion of this case. On December 26, 1900, the land company had disposed of about 133 of these reservoir rights, and on that date it entered into a contract with the grantors of appellant, who contemplated the erection of a sugar factory and desired water to use in its operation. The part of the contract, material here, after omitting the formal parts, is as follows:

"That in consideration of the stipulations herein contained and the annual rental to be paid as hereinafter specified, the party of the first part (the Land Company) hereby agrees to supply continuously to the parties of the second part (appellant's grantors) or their assigns a stream of water measuring four cubic feet per second of time flowing through the canal of the party of the first part, known as the Loveland and Greeley canal, if needed, between September 15th and February 15th, in each twelve months covered by this agreement, beginning with September 15th, 1901, and ending on February 15th, in the year A. D. 1911, from such water as the said party of the first part may be able to lawfully get into its said canal or its Loveland reservoir each year, but the maximum quantity to be drawn from the said reservoir during the said period shall not exceed one twenty-fifth part of the total amount of water that may be in the reservoir each year. Said water to be used in the sugar beet factory which the parties of the second part are now contemplating erecting adjoining the town of Loveland in the county of Larimer, State of Colorado, and for no other purpose.

"The party of the first part, its successors or assigns, shall not be held accountable for the quality of water to be furnished under this agreement, neither shall the party of the first part be liable for any failure of supply nor for any shortage in the

supply of water herein contracted for that may arise by reason of litigation or want of legal right of the party of the first part to take, sell, carry or deliver water for the purposes herein mentioned, nor by reason of drouth or any casual or unforseen or unavoidable accident to its ditches or reservoir, or works connected therewith, but in case of any shortage in the supply as aforesaid, the party of the first part shall allow the parties of the second part or their assigns a *pro rata* deduction from the sum herein stipulated to be paid each year by the parties of the second part.''

Afterwards the land company transferred its ditches and reservoir to The Greeley and Loveland Irrigation Company, hereinafter called the irrigation company, and the grantees in the contract transferred the contract to the appellant, hereinafter called the sugar company. After entering into the contract of December 26, 1900, with the grantors of the sugar company, the land company, or the irrigation company, or both, sold about 155 reservoir rights to various parties. The contracts covering these 155 rights were the same as the contracts covering the 133 rights theretofore sold. These 288 rights, with the 1-25 mentioned in the contract, which seems to have been regarded by the irrigation company as 12 rights or 1-25 of 300 rights, disposed of all the reservoir rights prior to the commencement of this action.

The pleadings in this action are very voluminous. The appellees, White, Houston and Steele, each owning several reservoir rights, some of which were sold before and some after the date of the contract to supply water to the sugar factory, began this action against the irrigation company and the sugar company, setting up the construction, ownership and details of operation of the ditches and reservoir, the reservoir contracts, the contract with the grantors of

the sugar company, and alleging in substance that the irrigation company had supplied and would continue to supply to the sugar company more than 1-25 of the water which was collected in the reservoir, or capable of being collected therein, either by permitting water to pass by the headgate of the Barnes ditch and into the canal, or by taking it direct from the reservoir, so as to supply the sugar company a continuous flow of four cubic feet per second and at times more than that amount, and praying that the sugar company be restrained from demanding or receiving more than 1-25 of such water as may annually be stored in the reservoir and from diverting from the Barnes ditch, water that may be lawfully stored in the reservoir from September 15th to February 15th in each year, and that the irrigation company be required to divert into the Barnes ditch, and store in the reservoir, all water coming to the headgate of the Barnes ditch during that period.

The court below found the issues in favor of the plaintiffs, and, in short, adjudged that all of the water reaching the headgate of the Barnes ditch should be diverted through that ditch, and stored in the reservoir, during the non-irrigation season; that the sugar company was not entitled to any water from the reservoir, unless it failed to get four cubic feet per second elsewhere, and then not in excess of the 1-25 part, and the court found that the sugar company was not entitled to any of the water that was stored in, or capable of being stored in, the reservoir, through the Barnes ditch, except the 1-25 part as aforesaid.   By the judgment the sugar company must depend upon the accretions of water in the river below the headgate of the Barnes ditch, and the seepage into the canal from the reservoir, and if from these sources it does not receive a flow of four cubic feet per second, it may demand and receive from the

reservoir, enough water to make up the deficiency, not exceeding the 1-25 part. The sugar company has appealed to this court. Its position is briefly stated in the reply brief as follows:

"Our claim is, the contract called for a continuous stream of four feet when available from the supply coming down the river to grantor's system during time specified, to be supplemented, if needed, by one twenty-fifth of water previously impounded in Lake Loveland, as a reserve to insure the quantity called for if at times the full river supply might not be available."

The sugar company thus claims that under the contract of December 26, 1900, it is entitled to receive in the canal a continuous flow of four cubic feet per second, from the water which reaches the headgate of the Barnes ditch, and that if insufficient water reaches the headgate of the Barnes ditch to supply such a flow, it may receive from the reservoir enough water to make up the deficiency, not exceeding 1-25 of what may be stored in the reservoir. While nothing is said in the quotation from the brief about the holders of reservoir rights, elsewhere it is said, that while the claimed rights of the sugar company cannot interfere with the holders of the 133 rights purchased before December 26, 1900, the reservoir rights sold after that date are subject to the contract as construed by the sugar company.

The errors assigned all turn upon the construction of that contract. If the construction by the lower court is right the judgment is right.

It is contended that during the operation seasons, from 1901 to 1903, immediately after making the contract, the factory owners received a continuous flow of four cubic feet per second. The sugar company it its claim does not make clear from whence this flow came. It claims that this was a con-

struction of the contract by the parties themselves, which permitted a continuous flow of four cubic feet per second from the waters of the irrigation system, and that this construction is deserving of great, if. not controlling weight. If the weight of a contemporaneous construction by parties to an ambiguous contract be admitted, as contended for, it cannot be applied here, for what was done by the parties to the contract from 1901 to 1903 does not conform to the construction now contended for. The court found, and that finding is binding because supported by sufficient competent evidence, that during all portions of the non-irrigation seasons, from the construction of the reservoir in 1893 to the commencement of this action in 1904, the owner of the reservoir "caused to be diverted, by means of its Barnes ditch, all of the waters flowing in said Big Thompson river at the headgate of said canal (Barnes ditch) and conveyed the same to said reservoir to be stored therein, for the use and benefit of said corporation (owner of reservoir) and the holders of its reservoir contracts." So that from 1901 to 1903, the factory received a continuous flow of four cubic feet per second in one of two ways: First, from accretions in the river below the Barnes ditch and seepage, supplemented by not exceeding 1-25 part from the reservoir; or, second, from the reservoir in excess of the 1-25 part. If the factory was supplied in the first way aforesaid, it was in entire harmony with the contract as construed by the court below. If, however, it received more than 1-25 part of the water collected in the reservoir, it was in direct conflict with an unambiguous provision of the contract and cannot be taken as a construction of a part of the contract, which needs no construction beyond its plain words. Another reason why it is doubtful whether the contemporaneous construction of the contract can have the

weight contended for is, that this contract affects the rights of third parties, the holders of reservoir rights who are not parties to it. Since the rights of those who are not parties to this contract are to be affected, it is likewise doubtful if the rule of strict construction against a grantor contended for should be applied here. In any event, it does not appear necessary to resort to such a rule. Human minds are bound to differ in the construction of a contract whenever there appears to be something in it that is ambiguous and uncertain. However, that which really appears ambiguous and uncertain to some may really appear unambiguous and certain to others.

What were some of the circumstances surrounding the water supply in the river at the time this contract was made? All of the water of the river coming to the headgate of the Barnes ditch had been appropriated for the reservoir, and for at least seven years before had been actually diverted from the river through the Barnes ditch into the reservoir and from thence had been supplied to the holders of reservoir rights. If such diversion of all the water was to continue the parties could not have had in mind any water from that source in excess of the 1-25 part stipulated. What other supply, if any, appeared available? Before the contract was entered into, examinations of the water supply were made and a measurement taken and it was found that there were three cubic feet in the canal from seepage, independent of any water from the river. The court found "that between the headgate of the Barnes ditch and the headgate of the Loveland and Greeley ditch (the canal) certain waters return into the Big Thompson river which are capable of being diverted by the Loveland and Greeley ditch varying in amount from 3 to 10 cubic feet per second of time; that certain water came into the Loveland and Greeley.

canal below its headgate from the outlet of the reservoir and other sources which does not come directly from the river and which aggregates from one to three cubic feet per second of time.'' The evidence showed, however, that much of this water was lost by seeping out of the canal and otherwise, before the factory was reached. It is alleged in the complaint that during the period from September 15, 1903, to February 15, 1904, the amount of water which the sugar company was entitled to receive from the accretions and seepage and 1-25 of that in the reservoir averaged not to exceed $2\frac{1}{4}$ cubic feet per second and varied in amount from time to time. However, here was a source of supply about which the parties might contract and from which they might reasonably hope to obtain the four cubic feet per second without interfering with other appropriations theretofore made, except possibly to the extent of 1-25 of the water in the reservoir. It is true that these accretions in the river and seepage in the canal were not certain and constant sources of supply. That the parties had in mind sources that were not certain and constant is evidenced to some extent by the fact that the supply was to be supplemented by water from the reservoir, if needed, and also by the fact that the contract itself protects the grantor in every conceivable way from a failure to supply four cubic feet continuously. It says that the grantor shall not be liable for a failure of supply and then provides that there shall be no liability for any shortage in the supply occasioned by litigation, want of legal right to supply, drouth, or accident, and that if there should be a shortage in the supply there should be a *pro rata* reduction of the annual rental, which was fixed at $625.00 a year. Looking at the contract itself, it says that there were to be supplied continuously four cubic feet per second of time flowing through the canal ''from such water

as the said party of the first part may be able to lawfully get into its said canal or its Loveland Reservoir each year.'' How much would the irrigation company be able to lawfully get into its reservoir each year? The answer is, all the water coming to the headgate of the Barnes ditch. There can be no dispute about that. After it has thus gotten into its reservoir such water as it might be able to lawfully get there, and which is all the water in the river at the head of the Barnes ditch, what water can it lawfully get into its canal? The answer is, the accretions and seepage which have been mentioned. It would be impossible for the irrigation company to get into the reservoir such water as it might be able to get there, and, at the same time, get any part of that water into the canal directly from the river, for no part of such water can be in two places at the same time. From such water as may be lawfully gotten into the canal and such water as may be lawfully gotten into the reservoir, the four cubic feet of the sugar company are to be drawn. If the contract stopped there the construction contended for by the sugar company might be irresistible. It does not stop there, however. It continues, ''but the maximum quantity to be drawn from the said reservoir during said period shall not exceed 1-25 part of the total amount of water that may be in the reservoir each year.'' The ''total amount of water that may be in the reservoir each year'' is, as before provided in the contract, such water as the irrigation company may be able to lawfully get into its reservoir and which, as has been seen, is all the water coming to the headgate of the Barnes ditch. It follows, therefore, that the maximum quantity to be drawn from the water coming to the headgate of the Barnes ditch shall not exceed 1-25 part of such water. To hold otherwise would be to render nugatory the limitation of the

1-25 part.  To say that under the terms of the contract more than 1-25 part of the water which may be gotten into the reservoir may be taken at the head of the Barnes ditch, but only 1-25 part of that which may be permitted to get into the reservoir may be taken, is in effect to entirely eliminate the limitation. Leaving out of view the difference, if any, in the loss by seepage, there is no difference in effect between taking the water directly from the reservoir and taking it on its way to the reservoir.  In either way more than the 1-25 part of the water which it may be able to get into the reservoir may be taken.  The contract does not appear to be one for the supply of a constant stream of four cubic feet per second, but appears to be one for the supply of that amount of water if it can be obtained from the water mentioned, for it provides that in case of a failure of supply there shall be no liability, but a *pro rata* diminution of the rent to be paid.

To this court the contract appears to be unambiguous and certain and as the lower court, after a more extensive examination of the facts and circumstances surrounding the making of the contract and its subject-matter, gave it the same construction as this court, the judgment is affirmed.    *Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE CAMPBELL concur.